**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| NEURALSTEM, INC., | * | |
| | * | |
| Counter-Defendant, | * | |
| | * | |
| v. | * | Civil Action No. AW-08-CV-1173 |
| | * | |
| STEMCELLS, INC., | * | |
| | * | |
| Counter-Plaintiff. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

This action involves a trade libel defamation suit brought by Counter-Plaintiff StemCells, Inc. ("StemCells" or "Plaintiff") as counterclaims against Counter-Defendant Neuralstem, Inc. ("Neuralstem" or "Defendant"). Currently pending before the Court is Neuralstem's Motion to Dismiss Counts three, four and five of StemCells' counterclaim. The Court has reviewed the entire record, as well as the Pleadings with respect to the instant motion. No hearing is deemed necessary. *See* Local Rule 105.6 (D.Md. 2004). For the reasons stated below, the Court will grant in part and deny in part Defendant's Motion to Dismiss.

## FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. On July 24, 2006, StemCells filed suit in this Court (the "StemCells Maryland Action") and asserted claims that Neuralstem infringed four of its patents. On June 19, 2007, the parties agreed to stay that action pending reexamination proceedings in the United States Patent & Trademark Office ("PTO") of the patents-in-suit. When the instant motion was filed, the StemCells Maryland

Action was both stayed and administratively closed[1].  (*See* Civil Action No. 06-1877, Dkt. Nos. 69, 70.)

On May 7, 2008, Neuralstem filed a Declaratory Judgment action in this court (the "Neuralstem Maryland Action") in response to StemCells' April 23, 2008 press release, announcing the issuance of United States Patent No. 7,361,505 (the "'505" patent).  StemCells asserted that "any third party wishing to commercialize neural stem cells as potential therapeutics or use them as drug screening tools will have to seek a license from us irrespective of how they derive the cells."  (*See* First Amended Compl. at ¶ 9.)  Neuralstem asserted that the "'505" patent was invalid, not infringed, and unenforceable.  Hours later, StemCells filed a complaint in the Northern District of California alleging infringement of another patent and California state law claims for trade libel and unfair competition.  On May 13, 2008, Neuralstem filed an Amended Complaint seeking a declaration of non-infringement and also a declaration that whatever statements it had made concerning the PTO examinations, the prior dispute between the parties, and the filing of this action, did not constitute "trade libel" or "unfair competition."  (*Id.* at ¶ ¶ 63-71.)

Neuralstem released three statements to the public.  The first was an announcement made on May 22, 2007, at a Wall Street Analysts Forum by Neuralstem's President and CEO, Richard Garr, stating that:

---

[1]Parties filed a joint motion to re-open the case on May 15, 2009.  The Court granted the motion June 8, 2009.

Well, also you refer us to the infringement law suite [sic] was filed last August by StemCells, Inc. and obviously we are not infringing their patents.  But it actually hasn't gone anywhere.  ***At this point, the patent office has ruled that all of the patents [StemCells] accused us of infringing are invalid.  In fact, [StemCells] have little bit, it's preliminary because they get to fight it out, but the preliminary ruling was that all of the claims in all the patents, they are not valid.***  So, I think for a couple of years nothing will happen until and unless they make it out of the patent office even in those patents, intact.  Yeah.

*Id.* (emphasis in original).

On March 28, 2008, Neuralstem issued a press release on its company website in the

"Investor Relations" section, stating that:

In September the Company announced that it received notice that the United States Patent and Trademark Office (USPTO) had issued its first ruling in the reexamination of the four StemCells, Inc. patents requested by Neuralstem.  In ruling the Patent Office rejected on multiple grounds all of the claims StemCells attempted to assert against Neuralstem in its law suit in all four of StemCells' patents that it examined and the lawsuit was subsequently dismissed.  The Company believes that the Patent Office has now correctly found that these claims should never have been issued in the first place.

(StemCells' Counterclaim at ¶ 40.)

The third public release statement was made on May 7, 2008, by Neuralstem's President

and CEO, Richard Garr, stating that:

While...we have not yet been directly accused by StemCells, Inc. of infringing this patent, ***the threatening statements in their press release of April 23rd leave the misleading impression that we would require a license from them as a result of the issuance of this patent.***  Nothing could be further from the truth," said Neuralstem President & CEO Richard Garr.  "And, in addition to finding that the patent is unenforceable against us, or anyone else for that matter, as a result of their actions, we are asking that the Court also declare that we are not infringing the patent and that the patent is also invalid."

3

"We are confident ***that their intentional withholding of highly
material information and their intent to deceive the Patent
Office,*** will result in this patent being unenforceable," concluded
Garr.

(*Id.* at ¶ 41. (emphasis added).)

On September 11, 2008, StemCells filed an answer to Neuralstem's Amended Complaint
along with five counterclaims, three of which were directed at Neuralstem.  Neuralstem seeks to
have three of StemCells' counterclaims dismissed:  Count III - Injurious Falsehood/Trade Libel
in violation of Business and Professions Code; § 17200, Count IV - Maryland Common Law
Unfair Competition; and Count V – Unfair Competition Violation of California Business and
Professions Code § 17200.  On October 1, 2008, Neuralstem filed the instant Motion to Dismiss.

## STANDARD OF REVIEW

### Motion to Dismiss, Fed. R. Civ. P. 12(b)(6)

It is well established that a motion to dismiss under Rule 12(b)(6) of the Federal Rules of
Civil Procedure should be denied "unless it appears beyond doubt that the plaintiff can prove no
set of facts in support of its claim which would entitle it to relief."  *See Conley v. Gibson*, 355
U.S. 41, 45-46 (1957).  In determining whether to dismiss a complaint pursuant to Rule 12(b)(6),
this Court must view the well-pleaded material allegations in the light most favorable to the
plaintiff and accept the factual allegations contained within the plaintiff's complaint as true.  *See
Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997) (*citing Estate Constr. Co. v.
Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 217-18 (4th Cir. 1994)); *Chisolm v. TranSouth
Finan. Corp.*, 95 F.3d 331, 334 (4th Cir. 1996).

The Court, however, is "not bound to accept as true a legal conclusion couched as a
factual allegation."  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citing *Briscoe v. LaHue*,

4

663 F.2d 713, 723 (7th Cir. 1981)); *Young v. City of Mount Ranier*, 238 F.3d 576, 577 (4th Cir. 2001) (the mere "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)").  Nor is the Court "bound to accept [Plaintiff's] conclusory allegations regarding the legal effect of the facts alleged."  *United Mine Workers of Am. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1994); *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).  Thus, a complaint may be dismissed as a matter of law if it lacks a cognizable legal theory *or* if it alleges insufficient facts to support a cognizable legal theory.  *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984) (citing 2A J. Moore, Moore's Federal Practice ¶ 12.08 at 2271 (2d ed. 1982)).

## DISCUSSION

### I.    Choice of Law

The first issue before the Court is to determine whether California or Maryland law applies to the instant motion.  Neuralstem contends that California privilege law applies.  In support of its argument, Neuralstem points to the fact that a federal court must apply choice of law rules of the forum state, here Maryland.  *Superior Bank, F.S.B. v. Tandem Nat. Mortg. Inc.*, 197 F. Supp. 2d 298, 309 (D. Md. 2000).  Where the substantive area of the chosen state's law is unclear, the court sitting in diversity is obliged to interpret the law as it believes that state's highest court of appeals would rule.  *Liberty Mut. Ins. Co. v. Triangle Industries, Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992).  Because the *lex loci delicti commissi,* or the place of harm principle, proves difficult in multistate defamation, the Maryland Court of Appeals adopts the Restatement (Second) of Conflict of Laws.  *Abadian v. Lee*, 117 F. Supp. 2d 481, 485 (D. Md. 2000).  The Restatement (Second) Conflict of Laws §150 considers the state of plaintiff's domicile, the state of plaintiff's principal activity to which the alleged defamation relates, and the state where

5

plaintiff suffered the greatest amount of harm, as significant factors in deciding applicable law. *Id.* at 486.   When causes of action arise in tort, Maryland's choice of law rules require application of the law of the state where the tortious conduct or injury occurred.   *Superior Bank,* 197 F. Supp. 2d at 309.   In this case, StemCells' domicile, principal activity, and greatest harm suffered occurred in California.   Furthermore, nothing in the record indicates that StemCells has ever conducted business with Maryland or has had any contacts with Maryland, aside from filing litigation in this Court[2].   Accordingly, the Court finds that Maryland law is inappropriate and California law applies since California is the state where StemCells' reputation suffered the most harm.

On the other hand, StemCells argues that under the principle of depecage, both California and Maryland privilege law apply.   StemCells argues for the principle of depecage so that this Court can address the Fourth counterclaim, which applies Maryland common law and the Firth counterclaim, which applies California state law.   Under the principle of depecage, different issues in a single case, arising out of a common nucleus of operative facts, may be decided according to the substantive law of different states.   *Putnam Resources v. Pateman*, 958 F.2d 448, 465 (1st Cir. 1992).   The Maryland Court of Appeals has not endorsed depecage explicitly, but has "implicitly endorsed the use of laws of different states to address different claims under Maryland conflicts of law analysis."   *Trent Partners & Associates, Inc. v. Digital Equipment Corp.*, 120 F. Supp. 2d 84, 95 (D. Mass. 1999).   *See also National Glass, Inc. v. J.C. Penney Properties, Inc.*, 336 Md. 606, 616, 650 A.2d 246, 251 (1994) (holding that choice-of-law provision in contract between subcontractor and general contractor, which specified that parties'

---

[2] Both parties represented to the Court that StemCells does not conduct business in the state of Maryland. (Memorandum Opinion, Filed 08/27/2008).

contract would be governed by law of state which permitted waiver of mechanics' lien rights, was unenforceable as contrary to public policy of Maryland); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986) (finding that Maryland tort law applied for violation of statute and the case was remanded to consider whether Connecticut law applied for breach of contract.)

The principle of depecage does not apply in this case because the Maryland Court of Appeals has not explicitly endorsed depecage.   Neuralstem argues that this case is most analogous to *Trent Partners,* which in turns cites *National Glass* and *Johnson.*   Facts from *National Glass* and *Johnson* both show that depecage applies only to a limited set of facts.   In *National Glass,* the court held that Pennsylvania law cannot be applied to resolve the dispute despite choice of law provisions in a contract between a general contractor and subcontractor. 336 Md. at 616, 650 A.2d at 251.   Instead, Maryland law was applied because it was evident that Maryland's interest in the case was materially greater than that of Pennsylvania.   *Id.*   Clearly, the *National Glass* court did not apply laws of two different states and depecage was not endorsed. Furthermore, this case can be further distinguished from *National Glass* in that there is no contract between two rival pharmaceutical companies, and certainly a choice-of-law provision does not exist.   In a similar case, the *Johnson* court found statute violation existed and applied Maryland tort law.   785 F.2d at 511.   The *Johnson* court remanded the case to determine whether there was a breach of contract.   *Id.*   If the contract was breached, then Connecticut contract law will apply.   *Id.*   The *Johnson* case merely alluded to the possibility of depecage upon finding a breach of contract.   Unlike *Johnson*, this case does not involve a contractual issue.   All three counterclaims in this case fall under tort law as opposed to contract law.   As such, there is no need for this Court to consider different state laws given all claims fall under tort law.   Thus the Court will only apply California law.

The parties do not argue that StemCells' domicile, principal activity, and greatest harm suffered occurred in California.  Under Maryland's choice of law rules, the state where the tortious injury occurred controls, and thus the Court holds that California laws apply since StemCells' reputation suffered the most harm in that state.

## II.     Count III - Injurious Falsehood/Trade Libel

In Count III of this Counter-claim, StemCells contends that Neuralstem intentionally made false statements about the value or quality of StemCells' patents in order to devalue and injure the intellectual property of StemCells, to impugn the business honesty of StemCells, and to engage in unfair competition under California Business and Professional Code Section 17200. (StemCells' Counterclaim at ¶ 32.)  Neuralstem argues their public release statements are not liable for injurious falsehood/trade libel because their communications are protected by the First Amendment, California litigation privilege, and the California anti-SLAPP (Strategic Lawsuit Against Public Participation) statute.

### A.  _First Amendment_

First and foremost, Neuralstem argues that its press releases are protected by the First Amendment.  A statement that is "substantially true" will not be subject to liability even with "slight inaccuracy in the details."  _Smith v. Maldonado_, 72 Cal. App. 4th 637, 646-47, 85 Cal. Rptr. 2d 397,  402 (Ct. App. 1999).  However, StemCells argues that the speech was commercial, as well as false and misleading, and therefore does not merit protection under the First Amendment.

As a general rule, false or unlawful commercial speech is not entitled to First Amendment protection.  _United States v. Bell_, 414 F.3d 474, 481 (3rd Cir. 2005).  The first

inquiry for the Court is whether Neuralstem's speech was commercial as StemCells claims.  To determine if a speech is commercial, courts consider whether: 1) the speech is an advertisement; 2) the speech refers to a specific product or service; and 3) the speaker has an economic motivation for the speech.  *Id.* at 479.  An affirmative answer to each of the elements indicates "strong support" for commercial speech.  *Id.*

The Court finds that Neuralstem's press releases are commercial speech.  The public release statements made by Neuralstem are certainly company advertisements, and the public statements refer to patents, i.e., the product or service of Neuralstem.  And finally, Richard Garr, Neuralstem's President and CEO, had economic interests when speaking to existing and potential investors on Neuralstem's behalf.  Therefore, the Court considers public release announcements at the Wall Street Analysts Forum and the public release statements made on the company website commercial speech.

Having established that Neuralstem's press releases are commercial speech, the Court now considers the lawfulness of the commercial speech.  Commercial speech is entitled to protection under the First Amendment if it relates to lawful activities.  *In re R.M.J.*, 455 U.S. 191, 203 (1982).  However if the "particular content or method of the advertising suggests that it is inherently misleading or when the experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions."  *Id.*  In the present case, Neuralstem's press release is commercial, but the content was not entirely true and could be misleading.  First, Garr used incorrect terminology when describing the status of the patent process.  On the May 22, 2007, conference, Garr stated "the patent office has ruled that all of the patents they accused us of infringing are invalid."  In truth, the PTO had only granted

Neuralstem's petitions for reexamination, meaning there was a question of patentability and not that the PTO had decided the patents were invalid.  (StemCells' Counterclaim at ¶ 33, 35, 37.) Second, in Neuralstem's March 28, 2008, press release, Garr was quoted as saying the StemCells Maryland Action was "dismissed" and "believes that the Patent Office has now correctly found that these claims should never have been issued in the first place."  (*Id.* at ¶ 40.)  It is undisputed that the StemCells Maryland Action had not been "dismissed" but had instead been "stayed" pending reexamination of the four patents at issue.  (*See* Civil Action No. 06-1877, Dkt. Nos. 69, 70.).  Third, Garr was quoted on May 7, 2008, as saying that StemCells' "intentional withholding of highly material information and their intent to deceive the Patent Office will result in this patent being unenforceable."  (*Id.* at ¶ 41.)  This cannot be true as the PTO has not announced a finding of inequitable conduct.  Were Garr not an attorney himself, the Court might not accord his statement the same significance; however, a well versed attorney will know the distinction between different patent terminologies and will also know the significant impact his statements can make.  Given that all three commercial speeches were arguably false and misleading, the Court agrees with StemCells that none of Neuralstem's public statements are entitled to First Amendment protection because the public statements were unlawful.

   B.  *Litigation Privilege*

   Neuralstem argues that its press releases qualify as privileged communications under California Civil Code § 47(b). Under Section 47(b), "communications made in or related to judicial proceedings are absolutely immune from tort liability."  *Sharper Image Corp. v. Target Corp.,* 425 F. Supp. 2d 1056, 1077 (N.D. Cal. 2006).  On the other hand, StemCells argues that the California litigation privilege does not apply in this case, because the privilege does not

shield false statements broadcasted to the general public and does not shield statements that do not further the objective of the litigation.  *Silberg v. Anderson,* 50 Cal.3d 205, 213, 786 P.2d 365, 369 (Cal. 1990).

The principal purpose of litigation privilege is to provide freedom of access to the courts without fear of subsequent derivative tort actions.  *Id.*  The litigation privilege is generally described as applying "to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.  *Id.*

First, Neuralstem's press releases were made at a forum and on the company's website. They were not made in relation to judicial or quasi-judicial proceedings.  The second element of the test is satisfied because Neuralstem's President and CEO made the statements, and is arguably an authorized litigant.  Third, the press releases were made to actual or potential customers of Neuralstem's services and products for the purpose of securing sales.  The Court does not believe the press releases were made to achieve objectives of the litigation because the statements were made at a Wall Street Analysts Forum and on Neuralstem's website under "Investor Relations."  Neuralstem concedes that the purpose of the communications was to inform potential and existing investors of pending litigation involving Neuralstem.  And finally, although the press releases dispersed information related to the litigation, the information was incorrect and cannot be said to have some "connection or logical relation" to the litigation. Furthermore, the "connection or logical relation" must be a "*functional*" connection.  *Rothman v. Jackson,* 49 Cal. App. 4th 1134, 1146, 57 Cal. Rptr. 2d 284 (Ct. App. 1996).  Per *Rothman*, the communication must serve as a necessary or useful step in the litigation process; it must serve its

purpose. *Id*. The privilege "affords its extraordinary protection to the uninhibited airing, discussion and resolution of disputes *in, and only in, judicial or quasi-judicial arenas*." *Id*. Litigation privilege does not apply when mere content of the communication is related to litigation subject matter. *Id*. The Court agrees with StemCells that Neuralstem's press releases are not privileged under California litigation privilege law because the four-part test is not met.

### C. *California Anti-SLAPP Statute § 425.16*

Neuralstem argues that California's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute applies, and that the Court should strike StemCells' state claims for trade libel and unfair competition. StemCells asserts that the anti-SLAPP statute does not apply to commercial speech, and even if it did, Neuralstem has failed to meet its burden of proof.

California Code of Civil Procedure § 425.16, also known as the anti-SLAPP statute, provides "a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." *Rusheen v. Cohen,* 37 Cal. 4th 1048, 1056, 128 P.3d 713, 717 (Cal. 2006). A two-part process is used to evaluate an anti-SLAPP motion. Courts must determine "whether the defendant has made a threshold showing that the challenged cause of action arises from protected activity." *Id*. Once that threshold has been met, the Courts must then determine whether the "plaintiff has demonstrated a probability of prevailing on the claim." *Id*. However due to the abusive use of anti-SLAPP, California Legislature enacted the Code of Civil Procedure § 425.17, which expressly excludes commercial speech from California's anti-SLAPP provisions. *Cal. Code of Civ. Proc.* § 425.17(c) (2004). Under Section 425.17(c), anti-SLAPP does not apply against a person engaged in the business of selling or leasing goods or services, providing the following two conditions are met:

> (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is **made for the purpose of** obtaining approval for, **promoting, or securing sales** or leases of, or commercial transactions in, the person's goods or services... (2) **The intended audience is an actual or potential buyer or customer**, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer...

(*Id.* (emphasis added).)

In the present case, both conditions of the California statute are met.  First, Neuralstem's public release statements were made for the purpose of securing sales for its services and products.  Second, these statements were directed toward an audience of actual or potential buyers.  Neuralstem is a publicly traded company and concedes these public statements were made to a specific target audience comprised of existing and potential investors.  Therefore the Court finds that anti-SLAPP does not apply under Section 425.17(c) because Neuralstem's public release statements were made to existing and potential investors for the purpose of securing sales.  Accordingly, the Court will deny the Motion to Dismiss as to Count III of StemCells' counterclaim for injurious falsehood and trade libel.

## III.    Count IV - Maryland Common Law Unfair Competition

In Count IV, StemCells claims that Neuralstem has "damaged or jeopardized StemCells' business by numerous actions amounting to fraud, deceit, trickery, or unfair methods." (StemCells' Counterclaim at ¶ 47.)  Because the Court established above that California state law applies, Count IV of the counterclaim must be dismissed for its basis on Maryland common law.

**IV.     Count V – Unfair Competition Violation of California Business & Professions Code**

   **§ 17200**

StemCells contends in Count V of this Complaint, that Neuralstem has engaged and will continue to engage in unlawful and unfair practices, and promotions, in violation of Section 17200 of the California Business and Professions Code, including "disseminating false statements into California and elsewhere about actions of the Patent Office and actions of StemCells before the Patent Office." (*Id.* at ¶ 52.)   Neuralstem argues their public release statements do not constitute unfair competition in violation of California Business & Professions Code § 17200 because their communications are protected by the First Amendment, California litigation privilege, and the California anti-SLAPP.

Since Count V claims are analogous to those in Count III, analysis of both counts will be conducted in a similar manner.   Neuralstem's press releases are not protected by the First Amendment, the California litigation privilege, or the California anti-SLAPP statute.   First, Neuralstem's press releases were commercial, but the contents were not entirely true and can be misleading.   The Court finds that none of Neuralstem's public statements are entitled to First Amendment protection given that all three commercial speeches are false and misleading. Second, Neuralstem's false public statements were broadcasted to the public and did not further the objectives of the pending litigation.   Thus, the Court holds that Neuralstem's false public statements are not privileged under California Civil Code § 47(b).   Finally, Neuralstem's public release statements were made to actual or potential buyers for the purpose of securing sales.   As such, Section 425.17(c), anti-SLAPP does not apply and the Court will not dismiss StemCells' state claims for unfair competition.   Therefore, the Court agrees with StemCells that Neuralstem's press releases are not protected by the First Amendment, the California litigation

privilege, or the California anti-SLAPP statute.  Given that Neuralstem's press releases are not protected, the Court will deny the Motion to Dismiss as to Count V of StemCell's counterclaim for unfair competition in violation of Section 17200 of the California Business and Professions Code.

### CONCLUSION

For all of the aforementioned reasons, the Court grants in part and denies in part Defendant's Motion to Dismiss.  An Order consistent with this Opinion will follow.


<u>        August 4, 2009        </u>                <u>          /s/           </u>

           Date                                            Alexander Williams, Jr.

                                                United States District Court